Benjamin Moore, case number 17-13757. May it please the court, Andrew Adler from the Federal Defender's Office on behalf of Benjamin Moore. In this case, the government failed to meet its heavy burden to establish the specific and unequivocal consent of Mrs. Golding to search the couch in her home without a warrant. At no time did the officers request her consent to search the couch, and at no time did she affirmatively invite or request them to do so. All she did was report a domestic violence incident and then answer the responding officer's routine follow-up questions, and she did so while on the street two to three hundred yards away from where the search actually occurred. That falls far short of implied consent under this court's binding precedence in Bates v. Harvey, Beshear v. Rockdale County, Georgia, and United States v. Gonzalez. In Bates, for example, this court found no implied consent even though the officer in that case requested consent to search the home, and the individual responded, I guess so. The court found that too equivocal to implied consent. In this case, there was no request for consent at all, let alone a warrant, as there was not here. The only way for the government to meet its burden is to identify an affirmative and unambiguous invitation or request by the individual. In all of that precedent, there was a question whether the entry at all into the home was a violation of the Fourth Amendment. Isn't that correct? That is correct, yes. Okay, so we don't have a case, I don't know what the entry is, but I just want to make clear, we don't have a case like this where you don't dispute that there was consent to enter the home. That is correct. Those are entry cases, but the principles are the same. I understand that. We'll have to look at them, but we don't have a case like this where there was clearly an authorized entry. Is that correct? I think that is correct. Believe it is or it isn't. I don't believe there's a published case from this court dealing with the search of a... Let's say that you haven't challenged the entry as illegal. That's correct, yes. What I would say is the reason why the officers were authorized to enter the home was we believe exigent circumstances and the government concedes that that justification of that... I agree with you that we don't have exigent circumstances. They're outside, but they she consented to it and said fine and they did. In any event, we don't have a contested entry here. Yes, Your Honor, we're not disputing that. What we are saying is that once the exigency was gone and they were inside a home without a warrant, it should have occurred to them that they needed a justification to search the home and one possible justification would have been consent and they didn't bother to ask her at any point in time either on the street or even after the search had already happened and there's no... But the officer did not just willy-nilly say I feel like I'm just going to search through the home. He gets a broadcast from another officer saying, hey, there's a gun there. Who tells the officer that? The wife and she says to him, I think it's under a cushion in the sofa and the place is a mess. It's in disarray. From that could one not infer that the wife or know for sure the wife was telling them about a gun and infer from that her consent that he retrieved the particular gun since she gave the specific location? I think that's possible only if you reverse the burden of proof. It is not our burden to show that she would have refused consent had she been asked. It is the government's burden to show that she in fact did consent specifically and unequivocally and merely telling the officers that there was a firearm in the house in response to the officer's questions falls short of that of that standard. Wasn't there a third person who was in the house and so there might have been a concern for officer safety about having another person in the house along with a firearm? Of course and that is why they were authorized to enter the home. But before they searched the couch, they found that person, the roommate, removed her from the house. No, Your Honor, there was no male in the house. There's a record about one of them saying there Mr. Moore saying to the officers there's a male roommate. What happened is the the wife in recounting the incident was referring to another male who was in the residence earlier in that day but there was no male in the residence at that time. There was only a female roommate. There may have been a little confusion about that point. Somebody said, I've read, was it your client who had said there's a male? No, no, Mr. Moore on the street said there was a roommate in the house and later when Officer Dowling arrived in the street and asked Mrs. Moore, Mrs. Golding, what was going on, she said she started recounting the incident and that incident earlier in the day had involved another man and the officer may have believed that this the third person was a man but in fact she clarified and said no, no, no, it's a roommate and she's in her room and they ultimately, regardless of of what they thought, they went in, they determined that the only person in the house was this female roommate. They removed her, they secured the scene, they testified that nobody is going in or out of the home at that point and that precedes the search of the couch and that is why there's no dispute in this case that despite the lawful entry, the exigency was gone before they searched the the sofa. I think you're right, there are no exigent circumstances whether for the original entry or even this search but I thought she went back in the house with them, took them back in the house. What did they go back and why was Mrs. Golding going back into the house with the officers? The officers requested her to come back to the home to further explain what had happened. Oh, that's right. They, I remember now, they wanted her to walk through the house and tell them where the altercation began and how the events transpired. That is correct, your honor. They put her in the back of a patrol car, they drove her around the block, they removed her from the patrol car, she walked them through the house and and explained where things took place but of course that all happened after the search had already occurred. I thought what had happened is they saw the gun under the couch because they radioed in, Mrs. Golding says there's a gun under the couch. Isn't that what happened? Yes, that of course, that occurs beforehand. So she tells them the gun's in the couch and she's not in the house at that time. Correct. Okay, and so they lift up the couch, they see the gun, they don't take it, they just put the pillow back down, right? They do not put the pillow back down. What do they do? They take apart the couch, they take all the cushions off the couch and they leave the cushions off the couch. They leave the firearm in the couch where it is. They don't remove the firearm at the time but they do remove the cushion so it's it was not in plain view and that is how they discovered it by removing the cushion. They don't put the cushions back so then about a half an hour later they bring her back to the scene. She walks through the residence of course but search, the violation had already occurred by that point in time. So our view is that the only relevant facts here are what happened on the street. And the violation is removing the cushions from the couch searching for the gun. Correct. Okay. That's correct. They needed an additional justification because it was not in plain view. There was no exigency and they're in a home without a warrant and you know our position is that on the street that is the relevant exchange between Mrs. Golding and Officer Dowling. She is not told they are going to search the couch. She is not, she does not of course see them searching the couch. Do we know if he asked her a question about the gun or she just told him or we don't know? She first said, she says that he threatened to shoot her and when she says that he starts asking very targeted questions about where the firearm is. Where in the house? It's in the settee. What's a settee? Oh that's the sofa. Where in the mattress? And she is answering those specific targeted questions and our position is that answering an officer's investigative questions is not consent or a request or an invitation to go ahead and search that area. Especially when she could have easily done so. Is the search completed once they find the gun if they don't take the gun? The violation occurs, the search occurs by removing the couch cushions and seeing the firearm. That is the violation in our case. Is there any room here for some variation of inevitable discovery or independent source rule? And they clearly had probable cause to get a warrant to look for this gun. He had been searching for it trying to shoot her with it. There's a gun at loose in the house. She sort of knows where it is. Is there any room for that? Even had they not done this right now, they could have readily gone back, gotten a warrant without even any, you know, any use of the fact that she had told them. The government has never made either of those arguments in this case at any point in the litigation and we think if they could have in fact gotten a warrant and we don't know whether they could have or couldn't have, that only, if they could have, that only furthers the reason why they should have stopped at that moment when there was no longer any exigency. Then go get the warrant. That would be our response to that. In any event, this case was ultimately dropped. We don't know if there was enough probable cause or not. Probably, maybe there was. But, you know, it's never convicted of anything. Correct. Correct. I don't believe he was even charged, Your Honor. But be that as it may, he has served over two and a half years already in this case of his sentence. So he certainly is not getting off and we're not here to defend his actions in this case. What we are here to say is that when we're talking about implied consent and there's no request for consent by the officers, far more is required for the government to meet its burden. Let me ask you one more question before you sit down. I'm just looking at the R&R by the magistrate judge. If you think this is, well, I guess it doesn't matter because he's making the fact findings that Golden relates the defendant was searching for the gun in the bedroom, but she knew it was in the sofa. Is that what happened? She told that to Dowling? Yes. That is her . . . There's a gun in the sofa. Okay. And Golden says to Williams she wants to press charges and the defendant's pointed a gun at her before and that he picked up a knife as the defendant was trying. She picked up a knife. He's trying to do it. Why couldn't they . . . She says there's a gun in the house to verify her charges. Why couldn't they look at the sofa where she says there was a gun and look at it? They're trying to decide what to arrest him for and so forth. Her house, she says where the gun is. Why would that be an implied consent? Because she's saying he had a gun or he was looking for a gun. It's in the sofa. Lo and behold, they go in there and it's in the sofa and that verifies her she's not making this up. Your Honor, verifying her account is not an but I mean it's in part of the implied overall implied consent here. Why wouldn't that be enough? Because she's merely reporting to the officer what happened. She's trying to tell the officer here's the situation, here's the altercation and she's giving them a lot of facts about what they were arguing about and all of those things and she's just trying to make sure they understand what happened and that is what Officer Dowling is trying to do as well, trying to establish the participants. Thank you, you answered the question. But she did on more than one occasion say I want to press charges and in connection with that is also directing them to where a gun is. One infer from that, she's saying gun's under the cushion, get the gun, look for the gun. She did not say she wanted to press charges until after the officer relayed to the other officers where the gun was located in the couch and that is only more reason why they should have simply asked if it was all right if they could have retrieved it and our position is that merely saying where it is in response to the officer's questions is not an invitation to go get it. Thank you, you've reserved five minutes. Good morning and may it please the court, Eileen Cannon on behalf of the United States. Seated with me at council's table is David Turkin who handled this matter in the district court. The search of the defendant's gun was reasonable in this case and the district court correctly declined to apply the exclusionary rule. The relevant question for consent is would a typical reasonable person have understood the victim to be consenting to a search of the firearm that minutes before had put her at risk during a violent confrontation with the defendant. We think the answer is plainly yes under an objective reasonable standard which of course is irrelevant. What if she was down at the police station instead of being questioned 300 yards outside the house and she's having this conversation with the officer and the exact same conversation occurs and he says what happened was there a gun and she explains all of this. How would she know that there was then going to be a search of her house? Why would that give consent implied or otherwise of a concern you know for a search of her house? I think that would be a very different circumstance. What we're talking about here is a frantic victim of domestic violence calling 9-1-1 for help. She gets there after being um. But what if they had just taken her? They picked her up and they brought her down to the police station and and they had this discussion. I think it would be a very different case and the totality of the circumstances would certainly shift. Well because that same conversation how does the how does the nature of the consent whether it's implied or not change based on the exact same conversation if it occurs at the police station versus outside of her house? Well you're adding into an element of formalism to this interview it becomes much more in like an interrogation as opposed to the police responding to aid her. Exact same conversation. Yes but it's minutes it's minutes later it's far removed from the place where this domestic violent confrontation has just taken place. But the confrontation is also over and she's with the police in the scenario here. I'm not understanding. I just want to give you an opportunity to explain why you think the words would have a different meaning in that context. I mean the words wouldn't have a different meaning. She would still be saying to them um he threatened to shoot me and then very reason and I would I should mention she's the first person on the scene to alert the officers of the presence of a firearm. When they get there they're being told that there's a knife on the scene and so she's the one that volunteers that he was threatening to shoot her. Very reasonably he the officer then asks well does he have a gun and then follows up to ask where the gun is. Those are extremely reasonable questions. I agree those are reasonable questions there's no problem and if he had said do you mind if we take a look or go get it we wouldn't be here today. Yes. He didn't say that so how and and by the way she's not the one who gave him the keys so how did she even know that he was going to look for the gun at the time she told him where the gun was. Our position is that she's alerting the officers to the presence of a firearm and to the location precisely of the firearm in her home. Any reasonable officer in that circumstance would understand her to be consenting to the officer's search for that firearm to retrieve it and to diffuse a very dangerous situation that had just put her at risk minutes before. But see here's the thing it didn't diffuse any situation because this the area was already secured. You all have conceded there were no exigent circumstances. A search warrant could have been obtained because the house was secured. I mean I'm not sure I'm following you here. Well I think it's important to keep the timing into in perspective. The two officers who actually go in to conduct the protective sweep they enter in it takes them a total of three minutes from the point they enter the home conduct the sweep locate the roommate and then almost immediately thereafter direct the roommate to the porch and locate the firearm. This is a very very fast. Well that's true it does happen quickly but it seems like when you look at it by the tape or whatever the recording that the female roommate exited her roommate at 5 57 a.m. At 5 58 deputy Williams asked her to step outside on the front porch and she did at 5 59 is when and also at 5 58 after she steps out I guess Williams tells Valdez there's a gun in the sofa then at 5 59 which is after she's already out of the house that is the first time that Valdez removes the sofa cushions and finds the sawed-off shotgun right. Yes yes ma'am. So even though it's happening quickly there's still there's no exigency we've already established that and there I mean the place was secure at that point there's no question about that I mean the officers testified that the place was secure so why didn't they just either ask for consent directly or get a search warrant? Well the reason why they didn't ask for consent there's been a lot of discussion about that is because any reasonable officer in that circumstance would have understood her to be consenting they understood and perceived her to be consenting after all they wouldn't have been there had she not called 9-1-1 for assistance this entire encounter is extremely cooperative. Is calling 9-1-1 for assistance mean that you're consenting to a search of your house? No it does not but in this case what if they had found what if she had what if they had found cocaine or something in the house and it turned out it was hers and you know we were here on a suppression for her I mean that seems like she would then be saying she's not saying anything but you know you'd still be arguing that she gave implied consent I don't I don't know if we would your honor because here it was a targeted circumscribed search to look for the two items that had put her at risk just wait a second the gun and the knife the same exact thing happens but they go in and when they're in there they find they're digging through the couch and they find a bag of cocaine with a gun and it what what would have transpired as of that all I can say is that here what you should answer is if she had told us and by the way I have cocaine under the sofa and that's how you found the cocaine okay here she's saying where the gun is yes and that's the equivalent to what we have obviously if she didn't say there's cocaine in the sofa they go in there and do that then they can't get over the cocaine but if she says I have cocaine in the sofa too you might want to look under the sofa I've got some cocaine exactly and that'd be a different situation and in this case she like I mentioned she's volunteering the presence of a firearm these officers are there to help her she precisely identifies the location of the firearm she even uses hand gestures to tell them it's in the side portion of the couch all they do is go in there account for the firearm and ensure that it is indeed there and then at that point it becomes a crime scene and they don't want to taint or contaminate the evidence by handling it with their bare hands and so they at that point wait but this entire encounter if you view the government exhibits is entirely collaborative she at no point hints any discomfort with their presence or their conduct I guess you could argue had constructive possession of the gun because he couldn't find it in whatever state he was in he's looking for the gun she whether she hid it under the cushion or what she knew where it was so arguably she herself was directing him to an object for which she had constructed possessions right um potentially guess I hadn't analyzed whether she was had an intent to later exercise dominion over that firearm you were the gun but she definitely knew where the firearm was and in fact she's the one that chimes in in that communication with the officer and clarifies to deputy Dowling no he hid it in the in the sofa so she's participating in the exchange she's never once hinting that she doesn't want them there and I would note there's nothing to suggest that that the police overcame her will nothing to suggest that she either her age or intelligence or something would have undermined her ability to consent I don't think there's any question about that I don't think the concern is whether or not she had the ability to consent or the competency to consent the question is whether a reasonable person would have understood what occurred there to be her consent right that's correct so it also therefore doesn't matter what happened after they they did the search and found the gun right well it's part of in our view because because she didn't know what was going to happen afterwards but it is indicative of the entire encounter the fact that she subsequently goes through a reenactment point by point and explains to the to get a victim witness advocate out to the scene so she can file a temporary restraining order but we have to evaluate whether the whether the consent whether a reasonable person would have understood it is consent at the time that the search occurred not after the search occurred so I don't see how we can really consider what happened afterwards when we're trying to determine whether a reasonable person would have understood what she said as consent to search the house as just explaining her answers to you know just giving her answers to questions that she was being asked by the officers it is correct that you're examining the circumstances as they existed at that moment in the exchange between the victim and deputy dowling but it is still relevant in our view that her entire demeanor her gestures her statements throughout the encounter are wholly consistent with the victim who is seeking police assistance and wants them there to retrieve the could have potentially done something slightly but here's the problem right the problem the problem is that we don't know what she what her intentions were we just don't know and we couldn't we could very easily know if you know the officers if the officer had either gone back to his car and gotten there in consent form or simply just asked do you mind if we take the gun can we look for the wasn't present at the house when all of this was occurring I mean it just yes but she's a couple blocks away having a conversation with deputy dowling watching him as he relays the transmission to his fellow officers that the gun is in the sofa and then she participates in that exchange by clarifying that it was him who hit it she's entirely aware of what's happening and any reasonable officer in our view would understand her to be consenting to a search a limited search for those two items that put her at risk I would also want to stress that the fourth amendment inquiry focuses how long between that relay of that phone call and when she gets back to scene and goes back in to the house with the officers which is when they actually physically take the gun it's approximately 30 minutes because after she initially says the gun is in the sofa she then is asked to write a written statement she writes a lengthy statement on the scene the officer asks her to read it back for accuracy and then after after that a few minutes later is when they all go back to the residence and she does that reenactment point by point she's showing them the genesis of the disagreement with her husband and how it all started and then after that actually the officers bring in the defendant so that he can get his medication he can get his a large portion of that encounter so this is a cooperative encounter there is no hint of discomfort with the officer's actions the defendant himself gave the keys and although we're not proceeding on a consent theory via him I think it is relevant that he himself is not protesting their presence or the search of the fire if you're not proceeding under that theory why is that relevant because for example if he had been physically present protesting it would potentially change the calculus but why why because why because aren't we asking about whether whether mrs golden gave her consent I mean you all have you you all have not proceeded as you just said on the theory that he gave his consent that's correct all I'm saying is that that fact the fact that you don't have another occupant sort of contemporaneously objecting I think is relevant to the entire examination of the totality of the circumstances which is after all the fourth amendment test but I guess I'm sorry I'm just a little confused why would that be relevant to whether she impliedly gave her consent it's relevant insofar as it places everything in context obviously it's not a critical fact but the fact that he gave the key in response to detect deputy Valdez's request just shows that one of many facts to indicate that this is an entirely cooperative encounter they're not using any coercive threats or police procedures as we would have in those cases that my friend has cited such as Bates v Harvey and Bashir v Rockdale those are materially indistinguishable cases where you have a truly flagrant police conduct in one case in Bates you have officers barging into a third party's home to execute a civil commitment order and they're doing so in a very rough manner the homeowner herself is objecting to their presence contemporaneously we have nothing of the sort here we have a victim seeking help which is what we should be encouraging victims to do when we have officers quite reasonably reacting nobody's trying to discourage the victim from seeking help we would just like I mean myself I would just like to see you know the fourth amendment followed that's all and I'm I know the officers were doing the best that they could under the circumstances but it would have required one single question you know is it okay with you if we go and get the gun but that's not the test the test is not what would be it's not the test if the implied consent could be reasonably understood right that it's not the test but if it can't be reasonably understood then we have a problem well I think plainly it's reasonably understood under the and to retrieve the firearm in the sofa where she alerts them to not just the presence of the firearm but the precise location of it the exclusionary rule I will I will end with is a harsh sanction that's really reserved for flagrant and grossly negligent police conduct this is not what we have I have a question when he goes to the sofa who is the he that's Valdez right correct okay um now I'm looking at the magistrate order so the deputy pointed out that at any time there is a weapon is involved in the incident he wants to ensure that the weapon is safe I was trying to understand why he didn't take the weapon then okay why did he just Valdez do you agree he took the cushion you couldn't see it without the cushion that's correct and then I did not realize this your your uh count all the council says and he didn't put the cushion back on the weapon is that correct uh that is correct although there is a portion in the video where I think maybe the cushion was placed back I have to admit I'm not exactly sure and was this weapon loaded and unloaded um I know there were three loose rounds um I believe it was unloaded and the rounds were uh adjacent to the firearm but I I may be incorrect on that point whether it was loaded I know there were three loose rounds that were with the firearm right there we also have a question with the officer when somebody says there's a gun in the house could at least make sure that the gun is located and is safe I guess I don't know and that's all they did and actually if you go to page 30 wants to ensure that the weapon is safe or wherever the need for me to go apply for a search warrant for something that we were told by the victim it was there all I did was look for that weapon and make sure that weapon was safe I think that's a very indicative quote on the part of the officer who's being told by his colleague on the scene that the victim is precisely identifying the location of a firearm and we viewed in that light and under the totality of the circumstances yeah I'm not so sure the search is completed at the time I don't know it's just a unusual fact pattern I don't I don't know whether the search is completed at that time or whether that if they never took the weapon well they had to ultimately take point the weapon got taken because it was going to be exhibited trial when was that point that was um the same the same morning at this point it's the calls are coming in at about five um so maybe the seizure didn't get completed then but the search got completed because they found the weapon right I mean they went through the couch they lifted it up they found something they couldn't see until they searched the couch right yes and then the seizure of the weapon was that morning after they have taken Mr. Moore to the police station he's gotten his medication he's dressed the victim is there the roommate is there and then they put the weapon in evidence bags so as not to contaminate the evidence and then they process it as they ordinarily would um we ask that you uh please affirm the district court's order denying the defendant's motion to suppress and affirm his sentence as well thank you counsel um the officers in this case um were not proceeding on a consent theory they were proceeding on an exigency theory that we all agree was not applicable at the time of the search so um when the officer Valdez says yes I wanted to account for the firearm to make sure it was safe well if there's no exigency then that's not a valid justification there's either an exigency make sure the evidence was secured the firearm why couldn't they at least make sure there was she's saying there's a firearm they want to make sure nobody takes the firearm at least find the firearm and make sure the firearm is secure and because they're going to come in and help me with that because at that point they testified both officers that they had secured the scene the roommate was out nobody is coming in or out of the house a lone firearm in a couch in a house that is fully secured by the police is not an exigent circumstance it's not a danger to anybody that's why they were not allowed to account for the firearm on a safety rationale which is what was going on here and that rationale we all agree it was not valid so so that is why we see this change in theory now on appeal clients coming through after they've cited the gun they're then going to let him come through and roam through the house and find medications they they bring him in a half an hour later he's in handcuffs um he doesn't have a shirt on they bring him and he needs to get his medication before they bring him to the police station and he needs to get a change of clothes is that after they found the gun yes it's a half an hour later okay they found the gun had they not found the gun though had they not looked for the gun he would have been in the house at a time when there's a gun and nobody's sure where although you say he's not that intimidating because he had handcuffs well they could have if they could have chosen not to bring him into the house if they were concerned about that possibility they could have left him outside brought his medication brought his clothes out if that was a concern but the way they chose to proceed here was to go immediately into the couch and it's interesting that officer valdez a couple of minutes after he removes the couch cushions turns to officer williams and says did did officer dowling tell me to do that it looks like he he he kind of realizes that maybe they shouldn't have done this and officer williams says uh i told you to do it but i think even then even then after the search has already happened and there's a whiff that's something they have gone wrong here they don't ask mrs golding for her consent can i ask you a question suppose after all this happened and when they went back to the house the second time if they had explicitly asked her can we search the house would that have made the gun okay that would have gone a long way to his um now the question is would that have made the gun or take she signs a consent to search the house and then they take the hat the gun provided her consent was voluntary yeah we'll assume all that then then of course so that would have related back and made it okay to take the gun if they explicitly asked her right i understand it's and they say okay is it all right that we have already done this is that okay with you then no they didn't not gonna do that they're just gonna have her sign a consent to search the house or verbally say can we search the house and they search around the house and then they take the weapon i think that's a closer case given that the search had already you know where i'm headed which is why doesn't the implied consent when that happened also um at least be something under the totality of the circumstances we can consider at the because we can at least consider it it may not be enough in your view but can we at least consider the second entry in the house and what goes on there since they didn't actually take the gun they just put up the cushions left them there then they go back and before they actually take the gun they have whatever that encounter is i understand that but can we consider that encounter just like we would if she'd signed a consent i think it's possible to consider that in the totality of the circumstances however this court has i understand you're saying that's still not enough correct because this court has explained repeatedly in its published decisions that a failure to object is not sufficient in every one of this court's published cases it said that over and over again and here she didn't even have an opportunity to every time you see it you're going to find a failure object cases of is about the entry okay they're all about the entry i've tried to find some case like this i could not find a case like this where the entry is legal or nobody's contesting the entry you see that's what makes this case hard but your honor i think the principles are the same can you cite any case like this it doesn't i just don't think there's one doesn't cut against you doesn't cut for you it's just not one have you got any on failure to object case that is where the entry was okay i don't believe we have relied on any such case your honor but our our our view is that this court's decisions in gonzalez especially where it announces that principle explicitly cannot be cabined to cases where the law the entry is not being challenged okay that's helpful the point is that a failure to object is not sufficient especially whereas here there is no request for consent at all because when an individual is not put to the choice to agree to consent or refuse then the only way that you can infer consent in that situation is an invitation and express unambiguous invitation and our position is that that clearly did not happen here so we ask you one more thing if you don't mind for fourth amendment purposes for our analysis analysis purposes is there a difference between whether the officers just searched and didn't seize or both searched and seized no your honor that is not relevant at all because the constitutional violation happened at the moment of the search the seizure in this case although it may have happened later derives directly from the unlawful search of the couch so we don't understand there to be any constitutional distinction in that regard and the government does not argue that there is we respectfully ask that the court reverse the denial of the motion to suppress thank you counsel